UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DAIXON JOSE RAMIREZ TESARA,<br><br>Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, et al.,<br><br>Respondents. | CASE NO. 2:25-cv-01723-MJP-TLF<br><br>ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER |

## INTRODUCTION

This matter comes before the Court on Petitioner's Motion for Temporary Restraining Order (Dkt. No. 2). Having reviewed the Motion, the Opposition (Dkt. No. 13), all supporting materials, and the presentations made by the Parties at oral argument on September 11, 2025, the Court GRANTS the Motion.

## BACKGROUND

Petitioner Daixon Jose Ramirez Tesara is a 27-year-old asylum seeker from Venezuela. Fearing "violence and torture at the hands of the government," he, his partner, and her two

1   children, fled from Venezuela and arrived in the United States on January 11, 2024. (Declaration
2   of Daixon Jose Ramirez Tesara (Dkt. No. 4) ¶¶ 1–2; Declaration of Daimarys Jose Suniaga
3   Martinez (Dkt. No. 5) ¶¶ 1–3.) Upon his arrival, Ramirez Tesara was detained and the
4   Department of Homeland Security initiated his expedited removal proceedings under 8 U.S.C. §
5   1225(b)(1). (Ramirez Tesara Decl. ¶ 2; Declaration of Douglas Valladares (Dkt. No. 3) Exs. A–
6   B.) After Ramirez Tesara was found to have a credible fear of persecution should he be returned
7   to Venezuela, DHS rescinded his expedited removal order and issued a Notice to Appear, which
8   placed him into removal proceedings under 8 U.S.C. § 1229a (Valladares Decl. Exs. B–C;
9   Ramirez Tesara Decl. ¶ 2.)

10          Less than a month after crossing the border, Ramirez Tesara was released from detention
11  on parole authorized under Section 212(d)(5)(A) of the Immigration and Nationality Act.
12  (Valladares Decl., Ex. D (February 7, 2024, Interim Notice Authorizing Parole). His parole was
13  "valid for one year beginning from the date on this notice," i.e., February 7, 2024, and was set to
14  "automatically terminate upon [his] departure or removal from the United States or at the end of
15  the one year period" unless otherwise extended. (Id.) His parole was "conditioned on [his]
16  compl[iance] with the terms and conditions of [his] release," including reporting for "every
17  scheduled hearing before the immigration court and every appointment as directed by ICE." (Id.)
18  One such condition of release was his enrollment for monitoring by ISAP, an "Alternatives to
19  Detention" program operated by DHS. (Valladares Decl. Ex. E; Ramirez Tesara Decl. ¶ 3;
20  Declaration of Daniel Strzelczyk (Dkt. No. 14) ¶ 6, Ex. B.)
21          Following his release, Ramirez Tesara and his family moved to Oregon and his case was
22  transferred to the Portland Immigration Court. (Valladares Decl., Ex. F.) He filed his asylum
23
24

ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER - 2

1  application in October 2024, which the immigration court scheduled for a hearing in 2027. (Id.
2  Exs. G, H.)

3  Ramirez Tesara complied with the ISAP monitoring requirements during and after the
4  term of his parole. (Ramirez Tesara Decl. ¶¶ 3–4; Suniaga Martinez Decl. ¶¶ 5–6.) However, on
5  August 14, 2025, Ramirez Tesara was informed that he had failed to respond to an ISAP
6  monitoring call which had been scheduled to take place three days earlier, despite having missed
7  work so that he could stay home and remain connected to the internet for the purposes of
8  receiving the call. (Valladares Decl., Ex. J; Ramirez Tesara Decl. ¶ 6; Suniaga Martinez Decl. ¶¶
9  7–8.) He was instructed to present himself to the ISAP office on the following day, where he was
10 instructed to not miss an appointment in the future and was told to return home (Valladares
11 Decl., Ex. J; Ramirez Tesara Decl. ¶ 8.) On his way home, Ramirez Tesara received a call from
12 ISAP instructing him to report to the ICE office in person on August 18, 2025. (Id.)

13 Shortly after arriving for his August 18, 2025, appointment, Ramirez Tesara was detained
14 by ICE officers. (Ramirez Tesara Decl. ¶ 9.) Despite having signed a G-28 agreement permitting
15 him legal counsel during the appointment, he was not allowed to speak to his attorney during or
16 after his detention. (Id.; see also Declaration of Josephine Moberg (Dkt. No. 7) ¶¶ 2–3.) Within
17 hours of his detainment, Ramirez Tesara was transported from Portland, Oregon to the
18 Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington, where he remains
19 detained today. (Ramirez Tesara Decl. ¶ 12.) His removal proceedings are pending before an
20 Immigration Judge in Tacoma, and he is scheduled for a master calendar hearing on September
21 16, 2025. (Strzelczyk Decl. ¶ 10.)

22 Ramirez Tesara filed his Habeas petition (Dkt. No. 1) on September 8, 2025, along with a
23 Motion for Temporary Restraining Order (Dkt. No. 2.) Both the petition and the Motion seek his
24

immediate release from detention and a prohibition on his being re-detained by the Government Respondents without a pre-deprivation hearing. (Compare Pet. at 12 with Mot. at 17-18.)

## ANALYSIS

**A.    Legal Standard**

A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008). The purpose of a TRO is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010).

TROs are governed by the same standard applicable to preliminary injunctions. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). To obtain a TRO, Ramirez Tesara must show he is (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009). A TRO is "never awarded as of right," and the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 22.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in Winter. A stronger showing of one element may offset a weaker showing of another. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

1 | questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir.
2 | 2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

3 | **B.     Petitioner is Likely to Succeed on His Due Process Claim**

4 | Petitioner argues that he is likely to succeed on the merits of his argument because due
5 | process "requires Respondents to afford [him] a hearing before a neutral decisionmaker where
6 | ICE is required to justify re-detention." (Mot. at 6.) The Court agrees.

7 | In evaluating similar due process claims to that brought by Petitioner, Courts in the Ninth
8 | Circuit employ the three-factor test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976). See
9 | E.A. T.-B. v. Wamsley, No. C25-1192-KKE, --- F. Supp.3d ---, 2025 WL 2402130, at *3 n.4
10 | (W.D. Wash. Aug. 19, 2025) (collecting cases employing the Mathews factors in similar
11 | immigration detention contexts). Petitioner urges the Court to follow suit; Respondents are silent
12 | on the issue. The Court therefore assesses the likelihood of the success of Petitioner's claim
13 | under Mathews.

14 | As per Mathews, the Court evaluates (1) "the private interest that will be affected by the
15 | official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures
16 | used, and the probable value, if any, of additional or substitute procedural safeguard" and (3)
17 | "the Government's interest, including the function involved and the fiscal and administrative
18 | burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.
19 | The Court addresses these three factors in turn.

20 |     1.     **Petitioner Has Considerable Private Interest in His Freedom**

21 | Petitioner argues that he is likely to show that "has an exceptionally strong interest in
22 | freedom from physical confinement," particularly given his initial release from detention on
23 | parole. (Mot. at 9.) The Court agrees.
24 |

1    The Due Process Clause protects all persons, including noncitizens, from deprivations of life, liberty, and property without due process of law. Zadvydas v. Davis, 533 U.S. 678, 693 (2001). "Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690. Courts in this circuit have found that the "government's subsequent release of [an] individual from detention creates 'an implicit promise' that the individual's liberty will be revoked only if they fail to abide by the conditions of their release." Calderon v. Kaiser, No. 25-CV-06695-AMO, 2025 WL 2430609, at *2 (N.D. Cal. Aug. 22, 2025) (quoting Morrissey v. Brewer, 408 U.S. 471, 482 (1972); Doe v. Becerra, No. 2:25-CV-00647-DJC-DMC, --- F.Supp.3d ---, 2025 WL 691664, at *5 (E.D. Cal. Mar. 3, 2025) ("Freedom from imprisonment is at the core of the Due Process Clause") (citing Zadvydas, 533 U.S. at 690).

When he was released from his initial detention on parole, Petitioner took with him a liberty interest which is entitled to the full protections of the due process clause. See Doe v. Becerra, 2025 WL 691664, at *5 ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty.") Petitioner's actions since his initial release show that he has not only reasonably relied on this interest, but that the interest is weighty. Upon being released, Petitioner reunited with his family, whom he supported as the "primary breadwinner," became an active member of a local migrant support organization, and garnered considerable support from his community. (Moberg Decl. ¶ 2.) He and his partner had their first child together, who is a citizen of the United States. (Valladares Decl., Ex. J.) He successfully and timely filed for asylum. These actions were only made possible by Petitioner's freedom, which is "the most elemental of liberty interests[.]" Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004).

1     Contrary to Respondents' arguments, this private interest did not expire along with
2 Petitioner's parole agreement. Once established, Petitioner's interest in liberty is a constitutional
3 right which may only be revoked through methods that comport with due process, such as a
4 hearing in front of a neutral party to determine whether Petitioner's re-detainment is warranted.
5 See Padilla v. U.S. Immigr. & Customs Enf't, 704 F. Supp. 3d 1163, 1172 (W.D. Wash.
6 2023) ("The Supreme Court has consistently held that non-punitive detention violates the
7 Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized
8 hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's
9 legitimate goals.") (citations omitted). That the express terms of the parole notice allowed for
10 discretionary termination or expiration does not somehow obviate the need for the Government
11 to provide a individualized hearing prior to re-detaining the parolee. See Pinchi v. Noem, No.
12 5:25-CV-05632-PCP, --- F.Supp.3d ---, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025)
13 ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal
14 proceedings, after that individual is released from custody she has a protected liberty interest in
15 remaining out of custody") (collecting cases). Further, the Court notes that Respondents' parole
16 expiry argument does not explain why they found Petitioner to be eligible for parole on February
17 7, 2024, but not the following year even after he had established deep ties to the community,
18 maintained employment, became the father of a U.S. citizen, and timely filed an asylum
19 application. See, e.g., Y-Z-L-H v. Bostock, No. 3:25-CV-965-SI, --- F.Supp.3d ---, 2025 WL
20 1898025, at *14 (D. Or. July 9, 2025) (noting that such discrepancy may be considered an
21 arbitrary and capricious decision, subject to challenge under the Administrative Procedures Act).
22     Accordingly, the first Mathews factor weighs in Petitioner's favor.

### 2. Risk of Erroneous Deprivation is High

Petitioner next argues that his re-detention without a hearing results in a risk of erroneous deprivation of his protected interest. (Mot. at 11–13.) The Court agrees.

Petitioner's re-detention was a discretionary decision based—at least facially—on records showing "approximately 40 ATD violations between February 2024 and July 2025," which are "considered indicators that an alien is a flight risk." (Strzelczyk Decl. ¶ 7.) While Petitioner is alleged to have missed a scheduled phone call, the record shows that he skipped work to be in a position to take the call which he never received. Additionally, upon learning of the missed call, he immediately sought to remediate the potential violation by, among other things, presenting himself in person to ICE officials, bringing his partner and child in tow. This does not paint the picture of a flight risk. Regardless, the fact "that the Government may believe it has a valid reason to detain Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process." E.A. T.-B, 2025 WL 2402130, at *4 (citing Guillermo M.R. v. Kaiser, --- F. Supp. 3d ---, No. 25-cv-05436-RFL, 2025 WL 1983677, at *7 (N.D. Cal. July 17, 2025)).

This second Mathews factor therefore weighs in Petitioner's favor.

### 3. Respondents' Interest in Petitioner's Re-detainment is Minimal

Finally, the countervailing governmental interest in Petitioner's re-detainment is minimal. In its briefing and at oral argument, Respondents "identified no legitimate interest that would support the specific detention of Petitioner without a pre-detention hearing. Calderon, 2025 WL 2430609, at *4. Nor have Respondents claimed that providing a pre-detention hearing would be an administrative or financial burden. Id. The third Mathews factor weighs in favor of Petitioner.

In conclusion, the Court finds that all three <u>Mathews</u> factors weigh in favor of Petitioner, and that he is therefore shown a likelihood of success on the merits of his claim. He should be released and only re-detained after a hearing front of an immigration judge.

### C. Petitioner Will Likely Suffer Irreparable Harm

As to the second <u>Winters</u> factor, Petitioner will undoubtedly suffer irreparable harm in the absence of a temporary relief. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)). Similarly, "in cases involving a constitutional claim, a likelihood of success on the merits usually establishes irreparable harm." <u>Baird v. Bonta</u>, 81 F.4th 1036, 1048 (9th Cir. 2023). Petitioner here brings a constitutional claim which is likely to succeed on the merits. Accordingly, the Court finds that he has established irreparable harm, and therefore the second <u>Winters</u> factor weighs in his favor.

### D. Balance of Equities and Public Interest Weigh Against Continued Detainment

The final two <u>Winters</u> factors—balance of the equities and consideration of the public interest—merge when the Government is the party opposing a TRO. See <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009); <u>Padilla v. Immigr. & Customs Enf't</u>, 953 F.3d 1134, 1141 (9th Cir. 2020). These factors weigh heavily in Petitioner's favor. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." <u>Hernandez v. Sessions</u>, 872 F.3d 976, 996 (9th Cir. 2017) (citing <u>Preminger v. Principi</u>, 422 F.3d 815, 826 (9th Cir. 2005)). And while the public may have an interest in "prompt execution of removal orders," (Opp. at 13 (quoting <u>Nken</u>, 556 U.S. at 435)), these interests do not outweigh the constitutional concerns raised by Petitioner. The third and fourth <u>Winters</u> factors therefore weigh in favor of temporary injunctive relief.

\* \* \*

Having considered the four Winter factors, the Court finds that (1) Petitioner is likely to succeed on the merits of his due process claim; (2) there is a high risk of him being erroneously deprived of his freedom without injunctive relief; and (3) Petitioner's interest in protecting his constitutional rights outweigh Respondent's interest in his continued re-detainment. Accordingly, the Court finds that the TRO should issue and therefore GRANTS the Motion.

**E.      Respondent's Release is Necessary to Restore the Status Quo**

The Court finds that Petitioner's request for immediate release is necessary to restore the status quo ante litem. This "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir.1963)). The pending controversy stems from Petitioner's re-detainment on August 18, 2025, when Petitioner presented to the ICE offices. At that time, his parole agreement had expired, but the record reflects that he had continued to follow the terms of his release by submitting pictures of himself, responding to messages and phone calls, and reporting to ICE officers in person when requested. Therefore, the Court will restore Petitioner to this quasi-supervised status—i.e., following the terms of the parole agreement as if it were still in force—as was the status quo from February 7, 2025, through his detention. Doing so will maintain the status quo ante litem and prevent irreparable harm while allowing for his claims to be adjudicated on the merits.

# CONCLUSION

Petitioner's Motion is GRANTED. Respondents and all their officers, agents, servants, employees, attorneys, and persons acting on their behalf, in concert, or in participation with them are:

(a) ORDERED to immediately release Petitioner from custody under the conditions of his expired parole agreement, as discussed above;

(b) PROHIBITED from re-detaining Petitioner in connection with his existing removal order without prior approval from this Court or until this Order expires.

This Order will remain in place for 14 days. Within that time, Petitioner may (1) file a motion for preliminary injunction to extend the prohibition on his re-detainment until such time as the Court issues final judgment on his habeas petition; and (2) request an extension of the TRO until such time as the Court issues a written order on the preliminary injunction. See Fed. R. Civ. P. 65(b)(2).

Finally, Petitioner may file a motion for his attorneys' fees associated with the instant Motion by Monday, September 22, 2025. A response, if any, will be due Friday, September 26, 2025. Both the motion and response should be limited to 2,100 words, and are REFERRED to Magistrate Judge Theresa L. Fricke for her consideration.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 12, 2025.

Marsha J. Pechman
United States Senior District Judge